# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs March 5, 2019

## STATE OF TENNESSEE v. GARY BARNETT

**Appeal from the Criminal Court for Shelby County**
**No. 17-01791      John Wheeler Campbell, Judge**

_____

## No. W2018-01027-CCA-R3-CD

_____

Following a trial, a Shelby County jury found Defendant, Gary Barnett, guilty of rape of a child and aggravated sexual battery, for which he received an effective sentence of thirty years' incarceration in the Tennessee Department of Correction. On appeal, Defendant contends that: (1) the trial court erred in admitting into evidence the forensic interview of the victim; (2) the trial court erred in restricting defense counsel's cross-examination of two witnesses; and (3) the evidence is insufficient to support his convictions. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Stephen Bush, District Public Defender; and Barry W. Kuhn (on appeal), Glover Wright, and Courtney Francik (at trial), Assistant District Public Defenders, for the appellant, Gary Barnett.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Senior Attorney General; Amy P. Weirich, District Attorney General; and Lessie Rainey and Jeff Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

### Pretrial Motion Hearing

On April 13, 2017, the Shelby County Grand Jury indicted Defendant for rape of a child and aggravated sexual battery. The State subsequently filed a motion to admit the victim's forensic interview at trial pursuant to Tennessee Code Annotated section 24-7-123. At a hearing on the motion, the victim, C.M.,[1] testified that she was thirteen years old and in the eighth grade. She explained that Defendant was her grandfather by marriage. C.M. recalled that, during October 2016, she spent part of her fall break with Defendant at his residence. Following her visit, C.M. was interviewed by Teresa Onry at the Memphis Child Advocacy Center. C.M. explained that the interview with Ms. Onry was recorded. She noted that she was wearing the same shirt at the hearing that she wore during her interview with Ms. Onry. She agreed that, when she spoke to Ms. Onry, Ms. Onry asked her questions, and they talked about things that happened with Defendant. C.M. stated that she previously viewed the recording of her conversation with Ms. Onry, that she recalled her conversation with Ms. Onry, and that she told Ms. Onry the truth. C.M. identified a DVD of her recorded interview with Ms. Onry, saying that she placed her initials on the DVD after viewing it in the prosecutor's office. The DVD was marked for identification as Exhibit 1. C.M. agreed that she would testify truthfully if called to testify at trial.

On cross-examination, C.M. testified that she was living with her father, stepmother, brother, and sister in October 2016. She agreed that, in the recorded interview, she and Ms. Onry spoke about C.M.'s family and about her biological mother. She agreed she told Ms. Onry that her biological mother "had a baby on the way[.]" C.M. explained that she last spoke to her biological mother "two summers" before the incident that occurred in October 2016. C.M. denied that she ever spoke to her biological mother about the allegations made against Defendant. C.M. stated that she only spoke about the allegations against Defendant one time before her interview with Ms. Onry and "that was at the Rape Crisis Center." She stated that she did not speak to police before the recorded interview with Ms. Onry.

Teresa Onry testified that she was a forensic interviewer employed by the Memphis Child Advocacy Center. Ms. Onry confirmed that she conducted an interview with C.M. on October 12, 2016. Ms. Onry explained that, prior to her employment at the Child Advocacy Center, she graduated from Tennessee State University with a degree in

---

[1] It is the policy of this court to refer to minor victims by their initials only.

psychology, and she worked for over eight years at the Tennessee Department of Children's Services. Ms. Onry testified that she had completed the minimum training requirements to work as a forensic interviewer, that she had learned the Corner House Protocol method of forensic interviewing, and that she had actively participated in peer review with regard to her interviews. Ms. Onry explained that the first step of the Corner House Protocol was to build a rapport with the child by talking about things that the child liked to do. She stated:

> You [then] want to move into where you're talking about family, that type of thing. Then you go into whether something has happened. You're exploring whether there's going to be a disclosure or not. And at the end, you give the child an opportunity to give any more information. It's basically the closing of the interview.

Ms. Onry confirmed that she had followed this protocol while interviewing C.M.

Ms. Onry testified that she reviewed the DVD containing the recorded interview with C.M. before the hearing. She identified Exhibit 1 and stated that it contained the recorded interview she conducted of C.M. on October 12, 2016. Ms. Onry stated that the recording contained the entire interview with C.M., that it was unaltered, and that it truly and accurately depicted C.M.'s complete interview.

On cross-examination, Ms. Onry acknowledged that, although C.M. stated the abuse had been ongoing "for about four years," C.M. only specifically discussed one incident that occurred a few days before the forensic interview. Ms. Onry agreed that C.M. did not provide contextual details for earlier alleged incidents. Ms. Onry confirmed that forensic interviewers were not supposed to ask leading questions and that a leading question was a question "that ask[s] a child to give a response that the question suggest[s]." When asked about specific questions posed to C.M., Ms. Onry denied asking C.M. any leading questions. Ms. Onry testified that her questions to C.M. were merely "follow-up questions," to which she could have said either yes or no. Ms. Onry explained:

> [T]he purpose of this interview is to . . . make sure the child gives a best possible statement of her experience. There are going to be times when those types of questions are asked, and again, my asking that question doesn't suggest to her that this is something that did happen or . . . [that] she should agree with me.

Following the hearing, the trial court found that the recorded forensic interview was "admissible based on the statute" and that Ms. Onry satisfied the statute and was

qualified as a forensic interviewer. The trial court also noted that, at the hearing, the parties stipulated that the Memphis Child Advocacy Center satisfied the relevant statute's requirements. After viewing the recorded forensic interview, the trial court entered a written order, finding "nothing that would . . . prohibit it from being admissible based on the statute[.]"

<u>Jury Trial</u>

At Defendant's subsequent trial, Sandra Gunter testified that she had been married to Defendant from 1990 until 1998, when they divorced. Ms. Gunter stated that C.M. was her granddaughter. Ms. Gunter testified that, in 2012, C.M.'s father and stepmother were having marital problems, and C.M. and C.M.'s father moved in with Ms. Gunter and Defendant, who was renting a room in Ms. Gunter's home on Daneman Street. C.M.'s father lived in the residence for about a month and then moved in with two friends. Ms. Gunter explained that C.M.'s father decided it would be best for C.M. to continue living with Ms. Gunter at that time. Eventually, C.M.'s father and stepmother "made amends[,]" and C.M. began living with her father, stepmother, and sister until their house was destroyed by a fire in February 2015. At that time, C.M. and her family moved back in with Ms. Gunter in her home, and Defendant moved to an assisted living facility. In May 2015, after C.M.'s stepmother had a baby, C.M.'s family moved to Millington, and Ms. Gunter moved in with her brother, who lived in Somerville.

Ms. Gunter recalled that, in October 2016, she was living in Somerville and working as a hairstylist at Custom Cuts. On the morning of October 8, 2016, she received a telephone call from C.M., while on the way to work. Ms. Gunter recalled that it was around 6:45 or 7:00 a.m. and "extremely early" for C.M. to be calling her on a Saturday morning. Ms. Gunter testified that C.M. was "very, very upset" and "was crying hysterically[.]" Ms. Gunter recalled that C.M. was calling from Defendant's cell phone. Ms. Gunter testified:

> She was screaming, "Meemee[2] you've got to come get me, I'm very upset[.]" [S]he was just crying and uncontrollably sobbing. And I didn't understand and I said, "Baby, what's wrong?" And she said, "Meemee I need you, I need you now and something's happened and I'm hurt" and she was rambling, you know.

C.M. told Ms. Gunter that she was at Defendant's residence. When Ms. Gunter told her that she had to go to work, C.M. continued to cry uncontrollably and said, "[D]o you remember . . . that thing that you always told me if someone touched me, or hurt me, that

---

[2] Ms. Gunter testified that C.M. referred to her as "Meemee" and Defendant as "Pawpaw."

- 4 -

I should tell you[?]" C.M. told Ms. Gunter that she had locked herself inside Defendant's truck and that she was scared.

Ms. Gunter testified that she drove to Defendant's apartment and found C.M. hiding behind a dumpster in the parking lot. C.M. was "shaking" and "extremely upset." Ms. Gunter returned the cell phone to Defendant and took C.M. home. On the drive home, C.M. told Ms. Gunter that Defendant "had hurt her and that she was scared[.]" C.M. said, "I can't do this anymore." Once home, C.M. told her father, stepmother, and Ms. Gunter that Defendant "had held her down and raped her." They immediately called police and were instructed to take C.M. to the police station. They were then escorted to the Rape Crisis Center.

Ms. Gunter stated that, during the time that C.M. lived with her and Defendant, Defendant would babysit C.M. after school because Ms. Gunter had to work late. Ms. Gunter recalled a "very inappropriate" occasion when she came home from work and found Defendant "shirtless" sitting on the couch; C.M. was sitting behind Defendant rubbing his back. Ms. Gunter further recalled that Defendant often bought C.M. things "when he couldn't even afford it[.]"

On cross-examination, Ms. Gunter stated that she and Defendant remained on good terms after their divorce and that he moved in with Ms. Gunter because of his health problems, sometime between 2010 and 2012. She explained that Defendant had a heart attack in 1999 and agreed that he had arthritis, asthma, COPD, diabetes, and hypertension. She confirmed that Defendant took a lot of medication and did not work due to his health problems. Ms. Gunter testified that Defendant was in the hospital several times from 2010-2012 but stated that "he loved to go to the hospital for pain shots."

Ms. Gunter testified that C.M.'s biological mother had custody of C.M. until C.M. was five years old. C.M.'s father and stepmother then obtained custody of C.M. until they separated and C.M. and C.M.'s father moved in with Ms. Gunter. C.M.'s father stayed for about a month before moving out and leaving C.M. in the care of her grandmother. After C.M.'s father and stepmother "got back together[,]" C.M. returned to live with them until the fire destroyed their house. Ms. Gunter acknowledged that she had instructed C.M. that, if anyone touched her inappropriately, C.M. should immediately tell her about it. She agreed that the first time C.M. told her about Defendant's abuse was on October 8, 2016.

C.M. testified that she was born on June 3, 2004, and that she was fifteen years old at the time of trial. C.M. explained that she had considered Defendant her grandfather during the time of the alleged abuse. C.M. recalled that, when she was eight and nine

years old, she lived with Ms. Gunter and Defendant at the house on Daneman Street. She explained that, during the school week, Defendant would watch her after school until 6:00 or 8:00 p.m., depending on the day of the week.

C.M. recalled the first time that Defendant touched her inappropriately. She explained that "it was like a nice, sunny day" and that she walked home from school. When she got home, Defendant told her to come into his bedroom. He then instructed her to get on the bed and take off her pants and underwear. C.M. testified that Defendant then put his fingers inside her vagina and "rubbed." She recalled that it hurt and that Defendant was rubbing on both the inside and outside of her vagina. Defendant told C.M. that, if she ever told anyone, he would hit her and that she would "go to jail." C.M. explained that Defendant continued to touch her in this manner "[f]requently, mostly every day." C.M. recalled another incident when Defendant told her to "get on [her] hands and knees on the bed[.]" She stated that Defendant got on his knees behind her and put his penis inside her vagina. She also recalled that Defendant had her touch his penis with her hand, stating that she and Defendant were sitting on his bed and that Defendant's pants were "down to his knees and his underwear was down and he had me touch his [penis] with lotion." C.M. said that the lotion came from a dresser in Defendant's bedroom and that, after she touched his penis, white "[s]tuff came out" of it. C.M. recalled that, on other occasions, Defendant put his mouth on her vagina while they were at the house on Daneman Street. She stated that these events occurred during the afternoons before her grandmother got home from work.

C.M. testified that she continued to see Defendant after he moved to North Lake Apartments, an assisted living facility, on weekends or during school breaks and that the sexual abuse continued during these visits. She stated that, in October 2016, she was visiting Defendant during her fall break. She explained that she went to his residence to "help [Defendant] out with his walking." After having dinner, Defendant told C.M. that he was going to touch her and that she "couldn't stop him." C.M. recalled that Defendant tried to take off her pants but that she would not let him, and she eventually went to sleep. When she woke up, Defendant was on top of her, and his penis was in her vagina. She recalled feeling "pressure" and stated that her pants and underwear were "down to [her] knees" and that it hurt. C.M. testified that she pushed Defendant off of her and locked herself inside the bathroom for two to three hours. Defendant attempted to unlock the door with a knife but was unable to do so. C.M. explained, "[T]hen he left me alone and then after a while I came out and then he took me to breakfast." C.M. recalled that, while returning from breakfast in Defendant's truck, Defendant said that he was "going to touch [her] all through this week." When they returned to his residence, Defendant got out of the truck, leaving his cell phone behind. C.M. locked herself inside the truck. C.M. testified that Defendant came back outside and told her that she needed to come inside. He also hit the window "really hard, trying to break it[.]" Defendant told C.M. that he

was going to break it and drag [her] through if [she] didn't come inside." When Defendant went back inside his residence, C.M. got out of the truck, hid behind a dumpster, and called Ms. Gunter. She told Ms. Gunter to "come get [her]" and that "I can't do this anymore." C.M. recalled having a medical examination performed by a nurse and participating in the recorded interview with Ms. Onry about her allegations. She affirmed that she told the truth while speaking to Ms. Onry.

On cross-examination, C.M. stated that she could recall the first instance of sexual abuse but did not know the particular day, week, or month that it occurred. She agreed that Defendant was not "very active" and that, eventually, he could not "get around" well. She also agreed that Defendant needed help because of his health problems and that she and Ms. Gunter had helped take care of him.

During cross-examination, defense counsel asked C.M. if she had ever "told a lie" after "swearing an oath to tell the truth." C.M. responded, "Not that I know of." The State then requested a bench conference, where the following exchange occurred:

> [THE STATE]: I'm not actually sure, based on those Juvenile Court records that [C.M.] testified in Court. I don't have any record, I don't have a transcript, or any way to-
>
> . . . .
>
> THE COURT: What I saw [in the Juvenile Court records], I could not tell, clearly, I mean do y'all have a transcript of her testimony[?] You have an order that doesn't make a lot of sense.
>
> [DEFENSE COUNSEL]: What we can show you Judge is the page that indicates she did testify, if you would like for me to-
>
> THE COURT: Well, let me ask you this, it says she did testify, does it say what she said?
>
> [DEFENSE COUNSEL]: No.
>
> THE COURT: Well then, I don't think you can cross-examine on what you don't know.
>
> . . . .

- 7 -

THE COURT: . . . I can't tell what [C.M.] said and I don't know what momma said and all I know is that the Magistrate made comments about momma. So I am not going to allow you to go down this road, unless we have something concrete, which we don't have. Unless you have something that I haven't seen, then I think that it is very unfair to cross-examine her as if she's told a statement, under oath, a false statement under oath, because I don't know what she said and you don't either.

. . . .

THE COURT: . . . You can ask her if she has ever lied about her father before and that's one thing, but to go in there and say about Juvenile Court and testimony under oath, no.

C.M. testified that her father attempted to gain custody of her when she was five years old. At that time, C.M. made a false allegation against her father; she said that he "put cigarette butts on [her] skin and [her] lips." C.M. explained that her biological mother told her to make the false allegation. C.M. agreed that, when she was in second grade, she skipped school and walked to her biological mother's place of employment. Additionally, she stated that, during the summer of 2016, she visited her biological grandfather, who allowed her to call her biological mother. C.M. testified that her father and stepmother did not want her to have contact with her biological mother. C.M. denied that, on the day she made the allegations against Defendant, Defendant confronted her for using his cell phone to call her biological mother.

C.M. stated that, on previous visits to Defendant's apartment, her younger sister was with her. She testified that Defendant touched her inappropriately every time she visited his apartment, but her younger sister did not see the abuse because she was asleep. C.M. agreed that she was supposed to care for Defendant over her entire fall break because he had "bad leg problems" and walked with a cane. C.M. agreed that she did not want to spend her fall break taking care of Defendant.

On redirect examination, C.M. stated that she received counseling at the Child Advocacy Center "for a while" and that the counseling made it "[m]uch easier" to talk about the sexual abuse.

Sergeant Stacy Hughes of the Memphis Police Department testified that he worked in the "sex crimes, juvenile abuse division" and that he was assigned to investigate the allegations against Defendant. Sergeant Hughes recalled that, on October 8, 2016, he received a call to report to the police department where he was to meet with Defendant. However, when he arrived, Sergeant Hughes was informed that Defendant

was complaining of chest pain and was being transported to the hospital. The following day, Sergeant Hughes arranged for C.M.'s forensic interview at the Child Advocacy Center. Sergeant Hughes explained that C.M. was sent to the Rape Crisis Center for an exam; a rape kit was completed and specimens collected, which were then sent to the Tennessee Bureau of Investigation (TBI) for testing. Sergeant Hughes spoke to Defendant by telephone, and Defendant agreed to come to the police department and submit a DNA sample. Sergeant Hughes explained that this was also sent to the TBI for comparison with any evidence from the rape kit.

Following Sergeant Hughes's testimony, the parties entered the following stipulation into evidence:

> Specific items were collected by the Memphis Police Department and the Rape Crisis Center, of evidence in this matter, including: vaginal and vulva [swabs] from the physical examination of [C.M.] by Margaret McCallem, as well as underwear, shorts and a shirt from [C.M.]. These items were tested for DNA by the Tennessee Bureau of Investigation. The examination did not reveal the presence of semen, or genetic material.

Teresa Onry testified that she was employed with the Memphis Child Advocacy Center as a forensic interviewer and that she was trained to talk to children in regard to allegations of abuse. Ms. Onry stated that she conducted an interview of C.M. at the Child Advocacy Center on October 12, 2016. Ms. Onry viewed a portion of the recorded interview and agreed that the video recording contained the forensic interview she conducted with C.M. The video recording was admitted as an exhibit to Ms. Onry's testimony and played for the jury.

On cross-examination, Ms. Onry explained that she followed the Corner House Protocol when interviewing children. She stated that C.M. disclosed an incident that happened on October 7, 2016, but that C.M. also mentioned that the abuse had been occurring over the past four years. Ms. Onry agreed that, under the protocol she followed, one of the things that she looked for was the amount of contextual detail a child victim could provide. Ms. Onry confirmed that C.M. did not provide many contextual details about the prior incidents during her forensic interview.

At this point, the State raised an objection, and the following colloquy occurred at a bench conference:

> [DEFENSE COUNSEL]: Your Honor, my questions relate to the protocols being admissible, because of those protocols.

THE COURT: I understand, but what exactly is the - I understand about the protocols, but where exactly are you going with the protocols?

[DEFENSE COUNSEL]: The protocols say that she should expect a certain level of contextual detail in [C.M.'s] answers.

THE COURT: Well it's all, how she [is] handling the child and obviously, you know, she can't form an opinion – I'm not going to let her – about whether or not the information is correct, or not. All she does is take the statement.

[DEFENSE COUNSEL]: I'm not asking if the answers are correct, Your Honor, but the protocol specifically says that you should expect a certain number of contextual details[.]

. . . .

[DEFENSE COUNSEL]: And Ms. Onry's testimony would be that [C.M.] was unable to provide contextual details that she would expect from her experience with a child of [C.M.'s] age.

THE COURT: Where did she say that?

[DEFENSE COUNSEL]: In the hearing on the admission video.

THE COURT: Well again, on the video we can go to, as far as her questioning, but at this point in time, what is the purpose of that? What is the purpose of this question?

. . . .

[DEFENSE COUNSEL]: [W]e have a right to cross examine the protocol as the way to get that statement and we have a right to cross-examine on what the protocol says that statement means.

THE COURT: I disagree with you there, I don't think that's proper, because the protocol doesn't determine truthfulness.

Ms. Onry agreed that, under the protocol, she should avoid leading questions and that the protocol defined leading questions as "questions that ask a child to give a

- 10 -

response that the question suggests[.]" She denied that she had used leading questions during the interview with C.M. The following colloquy then occurred:

> Q. Around the twenty-four minute mark of the video we just watched, you asked [C.M.] if she could feel [Defendant's] private somewhere on her body, during October of 2016 incident?

> A. Uh-huh.

> Q. Before you asked [C.M.] that question, whether she could feel [Defendant's] private somewhere on her body, she hadn't said anything about feeling his private on her body?

> A. No, but she did disclose that he was on top of her and that his private part was outside of his pants.

> Q. But, you would agree with me that before you asked [C.M.] if she felt [Defendant's] private somewhere on her body, she had not said anything about feeling his private anywhere on her body?

> A. No. And those types of questions, those are sensory questions, that is a natural follow up question to something that she had previously disclosed, him being on top of her. "What part of his body did you feel on you?" So to me that was a natural follow up question, a sensory question.

Ms. Onry agreed that she asked C.M. if Defendant ever put his mouth anywhere on her body and that C.M. replied that he had placed his mouth on her vagina. Ms. Onry acknowledged that, prior to her question, C.M. had said nothing about Defendant placing his mouth on her vagina. Ms. Onry testified that she did not ask C.M. any questions about alternative sources of information that she may have had about sex.

Margaret McCallem testified that she worked at the Rape Crisis Center in Memphis as a sexual assault nurse examiner. Ms. McCallem confirmed that she examined C.M. on October 8, 2016, and she prepared a report of her findings. Ms. McCallem first obtained C.M.'s medical history and then conducted a physical examination. She collected blood work, checked for injuries, and collected specimens based on C.M.'s allegations. C.M. told Ms. McCallem, "I went to my grandfather's yesterday, because he . . . can't walk to[o] well. I fell asleep on his bed and woke up in the middle of the night and I caught him touching me, inappropriately." C.M. said that she woke up to Defendant trying to put his penis in her vagina. After collecting samples, Ms. McCallem noted "quite a bit of redness" in C.M.'s "vulva area[.]" However, she

- 11 -

found no injuries. Ms. McCallem stated that the redness could be consistent with what C.M. reported had happened. Ms. McCallem explained that, due to C.M.'s age, she tested her hymen for sensitivity. When she touched C.M.'s hymen with a Q-tip, Ms. McCallem "got a small amount of blood from the Q-tip[.]" Ms. McCallem explained that C.M. was "fully estrogenized," which meant that there was more "elasticity to the hymen." She stated that the increased elasticity of the hymen meant that it could be penetrated and there be no injury. Ms. McCallem acknowledged that the redness she observed in C.M.'s vulva area and the blood collected on the Q-tip could have been caused by many different things. Ms. McCallem tested C.M. for several sexually transmitted diseases, but the tests were negative.

Officer Wayne Curry with the Memphis Police Department testified that he was tasked with picking up Defendant on October 8, 2016, after C.M. reported her allegations of sexual abuse to police. Officer Curry responded to Defendant's residence at North Lake Apartments around 8:15 a.m. Officer Curry explained that Defendant had been in bed and had a difficult time walking to the door to open it. Defendant was "on oxygen" and was using a cane or walker. Officer Curry and another officer assisted Defendant in putting on his clothes. Officer Curry recalled, "[Defendant] stated to us that his legs was [sic] going out, so we pretty much held his arm to keep him supported and walked him out to the [patrol] car."

Defendant testified that he was sixty-two years old and that Ms. Gunter was his ex-wife. Defendant stated that, following his divorce from Ms. Gunter, he moved into a home with his brother and a friend. However, when his health began to decline, Defendant rented a room from Ms. Gunter at the house on Daneman Street. Regarding his health, Defendant explained that he had suffered three heart attacks and two bypass surgeries and had diabetes and "thyroid trouble." When he moved back in with Ms. Gunter, Defendant was disabled and did not work.

Defendant recalled that C.M. lived in the house on Daneman Street for a year and a half to two years. He stated that his relationship with C.M. was "good" and that he came to think of her as his granddaughter. Defendant agreed that Ms. Gunter worked a lot and that he stayed at the house to cook, clean, and watch C.M. Defendant said that he helped C.M. with her homework after school and that they were in the house alone from 4:00 p.m. until about 8:00 p.m., when Ms. Gutner got home from work. Additionally, Defendant would take care of C.M. on Saturdays because Ms. Gutner worked until 4:00 p.m. Defendant testified that he often saw C.M.'s father and stepmother and that he had a good relationship with them. However, after C.M.'s father and stepmother moved into the house on Daneman Street with C.M.'s sister, the house became "overcrowded with too many people[,]" and Defendant moved to North Lake Apartments. He explained that North Lake Apartments were an assisted living facility, housing disabled people on

- 12 -

Social Security. Defendant recalled that he continued to see C.M. and C.M.'s sister because they would come to visit him at his apartment about once a month for two years. He explained that they would spend weekends with him and that their parents would pick them up on Sunday. Defendant stated that he slept on his couch, and C.M. and C.M.'s sister would sleep in his bed. Defendant denied that he ever slept in the bed with them. Defendant recalled that, on their visits, he would take C.M. and her sister to the park and to see movies.

Defendant testified that, by the time he moved into North Lake Apartments, his health had deteriorated and that he eventually "lost the use of [his] legs[,]" meaning that he had to use a cane or a walker while walking. Defendant said that he went to the hospital on October 3, 2016, because of his leg and his colon, and he spent the night in the emergency room before being released. He stated that, on October 7, 2016, he invited C.M. and her sister to spend the night with him, but C.M.'s sister already had plans. C.M. was on a break from school, and Defendant asked if she could help him clean his apartment. He recalled that she arrived at his apartment around 4:00 or 5:00 p.m. on October 7 and that they watched television until he went to get them something for dinner. After eating, C.M. and Defendant watched television and then went to bed. Defendant stated that he slept on the couch, and C.M. slept in the bed. Defendant stated that, before they went to sleep, nothing unusual had happened between them.

Defendant denied that he had ever seen C.M. naked and stated that she had never seen him naked. Defendant recalled that he woke up the next morning around 6:00. He woke up C.M. by shaking her on the shoulder. She got ready in the bathroom, and Defendant drove them in his truck to a donut shop. Defendant testified that C.M. helped him to his truck, and she went inside the donut shop to purchase the donuts. He stated that, while she was inside the shop, he looked at his cell phone and noticed "some deleted phone calls." He explained, "I had some numbers on there that were deleted off." When C.M. returned to the truck, Defendant confronted her about the deleted numbers and accused her of using his cell phone to call her biological mother. Defendant testified, "I jumped her butt[,] and she got mad." He stated that he got upset with her because C.M.'s father and stepmother told him not to let C.M. call her biological mother. According to Defendant, C.M. "got mad" and "blew up." She would not leave his truck when they returned to his apartment; she had his cell phone and was calling Ms. Gunter. Defendant returned to his apartment, and several minutes later, Ms. Gunter "c[a]me in, grabbed some books and stuff and cussed [Defendant] out and left."

Defendant testified that he was surprised by C.M.'s allegations. He provided police with a DNA sample during their investigation. He denied touching C.M.'s "private area[,]" and he denied putting his penis inside her vagina. He also denied making C.M. "do anything sexual" to him. He stated that he never raped C.M.

- 13 -

On cross-examination, Defendant acknowledged that C.M. would rub his back and that, one time, Ms. Gunter walked in when she was rubbing his back, and he did not have on a shirt. Defendant agreed that, other than the allegations of sexual abuse, C.M. was a truthful child. He denied that C.M. locked herself in his bathroom on the night of October 7 and stated that she did not have to push him off of her. Defendant said that he had no explanation as to why C.M. would accuse him of sexually abusing her.

At the close of proof, the State made an election of offenses, as follows:

So for count one, which is the rape of a child we're talking about the night before [C.M.] called her grandmother. We are talking about the testimony that you heard from [C.M.] that when she woke up, [Defendant] got on top of her, put his penis inside of her vagina, she told us very specifically that it hurt afterwards, that she felt pressure when that happened. So that is what we are talking about for count one.

For count two, for the aggravated sexual battery, we are talking about . . . the part of [C.M.'s] testimony where she talked about [Defendant] having her get the lotion and touch his penis with the lotion on her hand and she saw the white stuff come out and go on the bed.

Following deliberations, the jury found Defendant guilty of rape of a child, a Class A felony, and aggravated sexual battery, a Class B felony. The trial court subsequently sentenced Defendant, as a Range I standard offender, to concurrent sentences of thirty years for rape of a child and ten years for aggravated sexual battery.

Defendant timely filed a motion for new trial and amended motion for new trial. Following a hearing, the trial court denied the motion. Regarding Defendant's claim in the motion for new trial that the trial court erred in restricting Defendant's cross-examination of C.M., the trial court found:

[C.M.] was cross-examined at tremendous length about some of the matters that were contained within the juvenile court records and the DCS records. The victim was cross-examined about false statements that she made in regards to a matter at juvenile court. Now where the Court and . . . the defense disagree is when there was a question about impeaching her on or arguing that she lied under oath and wanted to bring out parts of the magistrate's findings there. As I said before, we don't know what she said in juvenile court. There is no transcript or record of what was actually said by her or whether she was under oath.

- 14 -

So the Court felt that that was improper to make that allegation or to make that, I guess, averment in front of a jury because it really wasn't a basis in the Court's mind, at least a factual basis, to justify that this was under oath and that she had lied under oath.

And really what she said we really don't know exactly what her words were. We have a reference in a magistrate's report. But the victim did testify that her mother made her say things that weren't true. And that was testified in front of the jury and obviously the jury heard it and took that into consideration in determining the credibility of C.M.

This timely appeal follows.

## II. Analysis

### A. Admission of the Forensic Interview

Defendant contends that the trial court erred in admitting into evidence the recording of C.M.'s forensic interview under Tennessee Code Annotated section 24-7-123. Defendant argues that C.M. failed to properly authenticate the recorded interview. Additionally, he asserts that the manner in which the interview was conducted was not reliable due to the interviewer's use of leading questions. The State responds that the trial court properly admitted the recording of the forensic interview. We agree with the State.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence lies within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)); *see State v. Brandon Lee Clymer*, No. M2016-01124-CCA-R3-CD, 2017 WL 5197292, at *11 (Tenn. Crim. App. Nov. 9, 2017) (applying abuse of discretion standard of review to question of admissibility of recording of a forensic interview), *perm. app. denied* (Tenn. Mar. 14, 2018).

Tennessee Code Annotated section 24-7-123 prescribes the criteria for admission of forensic interviews of suspected child sexual abuse victims. The statute provides for a

"limited exception to the general rule against the admission of hearsay evidence." *State v. McCoy*, 459 S.W.3d 1, 10 (Tenn. 2014). It states, in relevant part:

(a) Notwithstanding any provision of this part to the contrary, a video recording of an interview of a child by a forensic interviewer containing a statement made by the child under thirteen (13) years of age describing any act of sexual contact performed with or on the child by another is admissible and may be considered for its bearing on any matter to which it is relevant in evidence at the trial of the person for any offense arising from the sexual contact if the requirements of this section are met.

(b) A video recording may be admitted as provided in subsection (a) if:

(1) The child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination;

(2) The video recording is shown to the reasonable satisfaction of the court, in a hearing conducted pre-trial, to possess particularized guarantees of trustworthiness. In determining whether a statement possesses particularized guarantees of trustworthiness, the court shall consider the following factors:

(A) The mental and physical age and maturity of the child;

(B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;

(C) The timing of the child's statement;

(D) The nature and duration of the alleged abuse;

(E) Whether the child's young age makes it unlikely that the child fabricated a statement

- 16 -

that represents a graphic, detailed account beyond the child's knowledge and experience;

(F) Whether the statement is spontaneous or directly responsive to questions;

(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;

(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;

(I) The relationship of the child to the offender;

(J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and

(K) Any other factor deemed appropriate by the court[.]

Tenn. Code Ann. § 24-7-123(a)-(b) (2016).

At the pretrial hearing on the admissibility of the recorded forensic interview, C.M. testified that she was interviewed by Ms. Onry at the Memphis Child Advocacy Center following her allegations against Defendant. She stated that she viewed the recording of her interview with Ms. Onry prior to the hearing, that she recalled her conversation with Ms. Onry, and that she told the truth during the interview. She also noted that she was wearing the same shirt at the hearing that she wore during her interview with Ms. Onry. She identified the DVD of the recorded interview and said that she previously wrote her initials on it after viewing it in the prosecutor's office. C.M. agreed that she would testify truthfully at trial. Ms. Onry testified as to her qualifications as a forensic interviewer, and the parties stipulated that the Memphis Child Advocacy Center satisfied the statutory requirements. Defense counsel cross-examined Ms. Onry regarding her alleged use of leading questions during the interview. In response, Ms. Onry denied asking C.M. any leading questions and testified that her questions to C.M. were merely "follow-up questions," to which C.M. could have said either yes or no.

Defense counsel also cross-examined C.M. about the interview, including any motive she might have had to falsify or distort the event, such as possible bias or coercion. After hearing the testimony relative to the recorded forensic interview and watching the interview, the trial court found that it was admissible at trial under Tennessee Code Annotated section 24-7-123.

We conclude that the evidence presented at the pretrial hearing showed that the requirements of Tennessee Code Annotated section 24-7-123 were satisfied. C.M. authenticated the recording of the forensic interview and was subject to cross-examination by Defendant. Likewise, C.M. testified about the recording at trial, and Defendant was provided with an opportunity to cross-examine her about the statements in the recording and any inconsistencies. Thus, we conclude that the recording was properly admitted under Tennessee Code Annotated section 24-7-123. *See, e.g., State v. Clinton Austin*, No. W2014-01211-CCA-R3-CD, 2015 WL 2250464, at *10 (Tenn. Crim. App. May 12, 2015), *no perm. app. filed*. The Defendant is not entitled to relief on this basis.

## B. Cross-Examination of the State's Witnesses

Defendant next contends that the trial court erred in restricting his cross-examination of C.M. "regarding [a] false statement that she possibly made in juvenile court proceedings" in order to impeach her credibility. Specifically, Defendant argues that the trial court should have allowed him to ask C.M. whether she had falsely accused her father of putting out cigarette butts on her tongue, refusing to feed her, locking her in a closet, and forcing her to clean dishes and make her bed and accused her grandmother of poking a pencil in her ear and hitting her. Defendant further claims that the trial court improperly restricted his cross-examination of Ms. Onry by prohibiting him from asking her whether she expected a certain level of contextual detail from C.M. Defendant asserts that a lack of contextual detail from C.M. called her credibility into question. Defendant contends that the trial court's refusal to allow cross-examination on these subjects violated his constitutional right to conduct a meaningful cross-examination. The State responds that the trial court properly excluded defense questions about these issues. We agree with the State.

A defendant's constitutional right to confront the witnesses includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000). The denial of a defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within

- 18 -

the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citing *Coffee v. State*, 216 S.W.2d 702, 703 (Tenn. 1948); *Davis v. State*, 212 S.W.2d 374, 375 (Tenn. 1948)).  A defendant's right to confront witnesses does not preclude a trial court from imposing limits upon the cross-examination of witnesses, taking into account such factors as "harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994); *see also* Tenn. R. Evid. 611(a) (stating that the trial court has authority to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel").  Neither does a defendant's right to confront and cross-examine witnesses "mean that a defendant has a right to present irrelevant evidence." *State v. Sheline*, 955 S.W.2d 42, 47 (Tenn. 1997).  Absent a clear abuse of discretion that results in manifest prejudice to the defendant, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984) (citing *Monts v. State*, 379 S.W.2d 34 (Tenn. 1964)).

In this case, Defendant asked C.M. during cross-examination if she had ever "told a lie" after "swearing an oath to tell the truth."  Following an objection by the State, the trial court determined that Defendant had no proof that C.M. had lied under oath during juvenile court proceedings and, as such, ruled that Defendant had no factual basis for questioning her in that manner.  The trial court permitted Defendant to ask C.M. if she had ever made false allegations about her father but stated that Defendant could not pose such questions in terms of "a false statement under oath."  Under further cross-examination, C.M. testified that her father attempted to gain custody of her when she was five years old.  C.M. admitted that, at that time, she made a false allegation against her father; she said that he "put cigarette butts on [her] skin and [her] lips."  C.M. explained that her biological mother told her to make the false allegation.  Thus, Defendant was able to impeach C.M. based on her prior false allegations of abuse.  Additionally, based on the trial court's ruling, it appears that Defendant could have asked C.M. about other false allegations she may have made against her father, as long as Defendant did not frame the questions as C.M.'s making "a false statement under oath."  Defendant chose not to ask those additional questions.

During Defendant's cross-examination of Ms. Onry, Ms. Onry agreed that, under the protocol she followed, one of the things that she looked for was the amount of contextual detail a child victim could provide about an incident.  Ms. Onry confirmed that C.M. did not provide many contextual details about the prior incidents during her forensic interview.  Following an objection by the State, the trial court asked Defendant where he was "going with the protocols[,]" and Defendant indicated that he was going to ask Ms. Onry to explain what C.M.'s lack of contextual detail meant under the protocol. The trial court found that the testimony that Defendant sought to elicit from Ms. Onry

would have been irrelevant. The trial court stated, "I disagree with you there, I don't think that's proper, because the protocol doesn't determine truthfulness" and stated that it was the jury's role to determine the truthfulness of C.M.'s allegations.

We agree with the trial court that Defendant failed to show how testimony about how the protocol would interpret C.M.'s testimony was relevant. We first note that Defendant failed to make an offer of proof on this issue, other than to comment, "And Ms. Onry's testimony would be that [C.M.] was unable to provide contextual details that she would expect from her experience with a child of [C.M.'s] age." However, Ms. Onry testified that, during a forensic interview, she looked for the amount of contextual detail a child victim could provide and agreed that C.M. did not provide many contextual details about the incidents alleged to have happened while she was living with Defendant in the house on Daneman Street. On appeal, Defendant merely asserts that Ms. Onry's answer would have called into question C.M.'s credibility. However, during his extensive cross-examination of C.M., Defendant attacked C.M.'s credibility on multiple points. Under these circumstances, we see no clear abuse of discretion resulting in a manifest injustice to Defendant based on the trial court's limiting of Defendant's cross-examination of C.M. and Ms. Onry. Defendant is not entitled to relief.

## C. Sufficiency of the Evidence

Defendant also challenges the sufficiency of the evidence, arguing that the State presented no evidence to corroborate C.M.'s testimony. The State responds that the evidence is sufficient to support Defendant's convictions. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence

and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, rape of a child "is the unlawful sexual penetration of a victim by the defendant or the defendant by the victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2016). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7) (2016).

Tennessee Code Annotated section 39-13-504 states, in pertinent part, that aggravated sexual battery is "unlawful sexual contact with a victim by the defendant" when "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504 (a)(4) (2016). "Sexual contact" is defined as including "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Tenn. Code Ann. § 39-13-501(6) (2016). "Intimate parts" is defined as including "semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Tenn. Code Ann. § 39-13-501(2) (2016).

When viewed in the light most favorable to the State, the evidence is sufficient to sustain Defendant's convictions for rape of a child and aggravated sexual battery. The State elected to prosecute Defendant for the rape that occurred on October 7, 2016, when C.M. woke up and Defendant's penis was inside her vagina. C.M. recalled that on October 7, 2016, she was spending the night with Defendant at his apartment. C.M. stated that, when she awoke, Defendant was on top of her, and his penis was inside her vagina. C.M. recalled feeling "pressure" and stated that her pants and underwear were "down to [her] knees" and that it hurt. C.M. testified that she pushed Defendant off and locked herself inside the bathroom for two to three hours. C.M. testified that she was born on June 3, 2004, making her twelve years old at the time of the offense. Ms. McCallem, a sexual assault nurse examiner, testified that the redness she found around C.M.'s genital area was consistent with the disclosure made by C.M. Further, when Ms. McCallem touched C.M.'s hymen with a Q-tip, she saw a small amount of blood. This evidence is sufficient to support Defendant's conviction for rape of a child.

The basis of the charge of aggravated sexual battery was the incident where Defendant made C.M. put lotion on her hand and touch his penis until he ejaculated while he was sitting on his bed. C.M. testified that Defendant sexually abused her when she was living with him and Ms. Gunter in the house on Daneman Street when she was eight

and nine years old.  She recalled an occasion during which Defendant had her touch his penis with her hand.  C.M. stated that she and Defendant were sitting on his bed and that Defendant's pants were "down to his knees and his underwear was down and he had me touch his [penis] with lotion."  C.M. said that the lotion came from a dresser in Defendant's bedroom and that, after she touched his penis, white "[s]tuff came out" of it.  This evidence is sufficient to support Defendant's conviction for aggravated sexual battery.

Defendant argues, without citation to authority, that the accusations made by C.M., absent any corroborating proof, is not enough to sustain convictions for rape of a child and aggravated sexual battery.  Defendant's assertion is not a correct statement of the law.  A defendant can be convicted on the uncorroborated testimony of a child victim. *State v. Collier*, 411 S.W.3d 886, 899-900 (Tenn. 2013); *see also State v. Troy Love*, No. E2015-02297-CCA-R3-CD, 2017 WL 1077062, at *15 (Tenn. Crim. App. Mar. 21, 2017), *perm. app. denied* (Tenn. July 20, 2017).  At trial, Defendant denied that he committed any sexual act against C.M.  However, it was for the jury to determine the credibility of the witnesses, to reconcile any conflicts in the testimony of witnesses, and to weigh and value the testimony of the witnesses.  *State v. Finch*, 465 S.W.3d 584, 597 (Tenn. Crim. App. 2013) (citing *Bland*, 958 S.W.2d at 659).  In this case, the jury accredited C.M.'s testimony over that of Defendant's, as was its prerogative.  Defendant is not entitled to relief.

### III. Conclusion

For the aforementioned reasons, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE